Good morning, Your Honors, and may it please the Court. These consolidated appeals present a single question. Does the F-Quad-A, the Federal Aviation Administration Authorization Act, preempt California's longstanding requirement that all employers in the state provide their employees with breaks for meals or rest? The answer is no, for at least three independent reasons. You know, before we get to the reasons, I'd like to make sure we're all on the same page in terms of how this law, or this order, I guess it's a law and an order, applies to the industry here, or specifically to your clients. And maybe it's easier if I tell you what I think is going on, if you can correct me if I'm wrong. Maybe that's easier. So there are two requirements. There's the meal break requirement, and there is the break break requirement, the rest break requirement, right? Correct. And if I understand correctly, as to the meals, the employee can agree to waive? That's correct. But can withdraw the waiver at any time? And there's no way to buy one's way out of it, right? Well, you can ‑‑ the statute provides for a premium wage. I wouldn't characterize it as buying one's way out of it, but the failure to ‑‑ There's nothing wrong with buying. No, I mean, if it's an action permitted by law, there's nothing wrong with buying and selling. Right, so the statute provides that the employer must pay a premium wage for failure to provide the break. That's the consequence. This is the meal break or the rest break? I was on the meal break right now. Okay. I'm trying to understand the scheme, so I'm just running through. Sure, sure. So my understanding is that you can't buy ‑‑ the employee can agree but can withdraw the consent, and there's no way that the employer can force the employee to accept the absence of a meal break. If you're not sure. I believe that's right, but I'm going to make sure and let you know if I'm wrong. Okay. And then the way that would work is, just so I understand, it has to be a meal break that is away from all job duties? That's correct, although there can be an on‑duty meal break, provided there's an agreement in writing for it. I understand. You can agree, but that's unilateral. The employee can refuse to agree, right? That's right, Your Honor. Okay. It's also subject to the limitation that the break has to be provided only insofar as it's practicable to do so, and that turns on ‑‑ I think it's both. As I understand it, it has to both be not practicable to do and there has to be an agreement. Am I mistaken about that? No, I think that's not right. If it's not practicable within the context of a particular industry, then there's no requirement that there be a break. So, for example, we gave in our brief the example of an operating room nurse who's in surgery. I read the government's amicus brief description of it. So, again, this is the U.S. government's amicus brief description of it. They speak to it as a conjunctive. You have to have both impracticable and agreement. Maybe they're wrong about this and I'm working in the wrong place. Is your view different? I believe that's not correct. And the source for this is the California Supreme Court's decision in Brinker, which, you know, is the authoritative construction of the statute. And the California Supreme Court has said that there's a lot of flexibility in this requirement that there be breaks and that the flexibility has to be understood in the context of a particular industry. Okay, so I guess I understand what you're saying. So if it's not practicable, they can't do it. Now, I take it, how would this work in a trucking environment? The break has to be away from all job responsibilities. That means what, they would pull the truck over and lock it up and go in and have a meal to a restaurant or something? Yes. I mean, if you had truck drivers where the only time they could have the meal is the break is, you know, that they would be required to stop. But in the context of these cases, you know, there's no showing that that's even required. These are short trips, and the breaks could be taken when the drivers are not actually, would not otherwise be driving. Well, but I'm trying to figure out what happens with the truck. I mean, let's say they are at a stop. They're still responsible for the truck, right? That's right. So they go off and have a meal. They're still responsible for the truck. Maybe they have to keep an eye on it. I'm just wondering, what does it mean to be away from all job responsibilities? You know, if you are working an assembly line, let's say, right? You leave the assembly line. You go outside, or you go to a restaurant or something. The assembly line keeps going. You don't have any responsibility for it at all. I'm just wondering how this applies in the case of a truck driver, that no responsibility requirement applies for a truck driver who is given this piece of equipment that's worth $200,000 maybe. I don't know what a truck is worth, but I think it's something of that order, right? He's still responsible for it, right? That's right. So does that count if he is delivering stuff and he walks away from the truck and has his meal? Does that count as away from responsibility? Yes, that would certainly count. I think that Gordon Brinker said something along the lines of, although there has to be no delegated or specific responsibility during the meal period, the employer does not have to ensure that the employee, in fact, does no work. That's correct. During that time. That's correct. If you view sort of keeping one eye out to make sure somebody doesn't set the truck on fire as doing some work, it seems covered by Brinker. Exactly, Your Honor. Brinker makes clear that the employee is free to work. The employer's responsibility is only to ensure that the employee has the opportunity to take this break. And here's a quotation. They can't make sure that he has no opportunity to, you know, just walk away and have no responsibilities. I mean, there's a difference between saying, well, you know, the employee can sort of volunteer to take a lookout. But he's, in fact, responsible for the truck. I mean, you know, if somebody were to attack the truck, he'd have the responsibility to call the police or try to steal it. He'd have to go chase after it, you know, do whatever it is. Right. Now, of course, here you have two people that are in the truck. You have the drivers and the installers in the Diltz case. And, you know, one of them, presumably you could stagger the brakes so that one of those people is watching the truck and ensuring that it's in good condition while the other person is taking a break. Are they both? They're both in the truck, Your Honor. That's right. So let me go now move to the other regulation, the one dealing with rest breaks. Now, it wasn't clear to me, if they pay the premium wage, does that get them out of penalties? I believe that's right, yes. You know, when lawyers say, I believe, they say they don't know. I think that's right. Well, make me believe. I was more sure of it until you did. How are you to believe? Huh? Well, so. What is it that makes you believe that? So the. You might want to look at Section 226.7. 226.7, right. Which says, if an employer fails to provide an employee a meal period or a rest period in accordance with an applicable order, et cetera, et cetera, the employer shall pay one additional. Right, exactly. And in Murphy v. Kenneth Cole, the Supreme Court. Well, that's right. It does say that. But there's also a provision that says that there are penalties, $100, $50, $100 penalties. Where does it say that if you pay the premium wage, you can't also be forced to pay the penalty? Well, in our brief, we cite a brief filed by the Division of Labor Standards Enforcement, which is the agency of California that would assess the penalties. And what they've said in that brief, that was in a case called Dunbar-Armored, is that the employer may choose not to provide its employees with meal and rest periods, in which case it must simply pay the premium. And what does the position taken by that agency in a brief in another court mean for us? It means can they not change their mind? Are they bound? Is it like a regulation? Is it a law? What is the effect of that? I think it's much like the position of the United States in this case. It's made its position clear in an amicus brief. What happens when a federal comes who knows not Joseph and says, well, you know, we said that in that case, but I'm the new commissioner, or whatever the head of the agency is, and I take a new policy, and I think that we pay a penalty. You know, there's a penalty provision. We go after people because it's anything with the filing in that. Regulation is different. Regulations are bound until you change the regulation. Right. But is there anything that binds the agency to what they say in the amicus brief forever? Or can they just change whenever they feel like it? Well, I mean, it's a position that's, you know, no, they can change their position, certainly. The agency can also change its position in the regulation. There's nothing in the statute that says they're exclusive. They pay the premium wage. They get out of the penalty. There's nothing in the statute itself. Well, I mean, I think that's a fair. Or the order of the commission. I think that's a fair reading of the statute, and I think that's buttressed by the fact that that's the authoritative agency that interprets and enforces the statute. What's a fair reading? It has read it that way, that the, as you put it, that the employer can essentially buy their way out by paying the premium. But I don't see the language. I heard the language that Judge Grebe read, and that language, which I also read, doesn't say that to me. It says you can do this. This is one of the things that happens to you if you don't provide the press break. It doesn't say, and if you do that, you are then precluded from being subject to penalties, $50 and $100 for a predefender, right? It doesn't say that, right? That's true. It doesn't go that far, and I think that's why you need the gloss provided by the agency. But I want to make clear that our position — There's no state court ruling to that effect. There is no state court ruling to that effect. The closest is the Murphy v. Kenneth Cole case from the California Supreme Court from 2007 that says that the additional hour of pay is a premium wage intended to compensate employees and is not a penalty, and that's the consequence of noncompliance under the statute. It doesn't quite address your question, Judge Kaczynski. No, actually, matter of fact, it probably cuts against you because it says we also have penalties, so this is not, you know, this is a compensation, and we also have penalties, and this is not a penalty, so it's not difficult. Sure. But, you know, I want to get back to what I think is the question presented in this case, which is whether the Federal Aviation Administration Authorization Act preempts this generally applicable state law that applies to all employers in the state and has done so for 100 years. And the question that that presents is whether or not the State statute is related to prices, routes, or services in a way that matters for purposes of this Federal scheme. And the answer is no. The Supreme Court in this Court's cases has made clear that if the relationship to prices, routes, or services is too tenuous, that doesn't count for preemption. And here it, you know, this is sort of the classic generally applicable statute that regulates to the extent it has any effect on prices, routes, or services. Those effects are entirely incidental. The amicus briefs go through quite a bit of detail explaining the patchwork problem, as they describe it. And so my question to you is, does that discussion support a tenuous finding or a more significant finding? Well, you know, I think it's a consequence of living in a Federal system that there's going to be a patchwork of State requirements that affect any industry. And the trucking industry is no different. The mere fact that there's a patchwork of requirements doesn't mean that there's preemption. After all, the trucking industry is subject to different speed limits, different highway emissions rules, different way station rules, as they make their way. Some of those were accepted, though. And Roe talks about patchwork, what I call the patchwork problem. It does. It does, certainly. And so to the extent that what States are doing is imposing a patchwork that's related to the preemption purposes of the FQA, a patchwork that affects competition in the trucking industry and consumer choice, then that's certainly something that's relevant to FQA preemption. But that's not what's going on here. The patchwork here is the patchwork of State background employment law. States have different rules on anti-discrimination, on the hours that may be worked. And that's just true of a Federal system. And there's never been a suggestion by any court of appeals. This Court has quite twice rejected in the Air Transport Association case and in the Mendonca case the notion that the effects of a generally applicable employment law on employer operations is sufficient to preempt. No Federal court of appeals has held that generally applicable employment law is preempted under either of these two regimes, the Airline Deregulation Act or the FQA. Again, the amicus briefs go to some extent to distinguish Mendonca in light of Roe and to discuss Mendonca. What is its continuing viability? I think Mendonca is a perfectly good precedent in this circuit. I don't see anything in Roe that overrules Mendonca. And I think actually the Supreme Court's most recent pronouncement on the FQA, the FQA, is fully consistent with Mendonca. What the Supreme Court said in Dan City is that the phrase, with respect to the transportation of property, which appears only in the FQA and does not appear in the Airline Deregulation Act, massively limits the scope of preemption under the FQA. That's not an issue in this case, is it? The transport here does relate to the carriage of goods. Well, there's no question that my friends here are engaged in the transportation of property. But I think what the Court was doing there was they were pointing to Justice Scalia's interpretation of this statute. No, I'm not suggesting that there's a conflict. I just want to be sure that I understand the extent of your argument. Your argument is related simply to the phrase, prices, routes, or services, and is not related to the transportation of property aspect. That's right. I mean, I think with the with respect to transportation qualifier does, and this is what Justice Scalia explains in Ours Garage, is that it says that you have to look at the capacity in which the motor carrier is regulated. If they're regulated as an employer, they're regulated as a taxpayer, there's no preemption. The words he uses are that the regulations or provisions have to single out for special treatment motor carriers of property. And then he gives a series of examples of generally applicable laws that are actually much more closely related to transportation than the background employment laws we have here. So, and that same phrase, single out for special treatment, also appears in the New Hampshire Supreme Court's decision. And the unanimous decision of the Supreme Court in Dan City seems to cite both of those discussions with approval. So I think what the Court is saying is there's got to be some limit. This is a very indeterminate area of the law. Related to can mean anything. Can you comment on the federal HOS rules and how they should play in our analysis? Sure. You know, I think my friend from the United States will obviously comment on that too. In my view, there was an implied conflict preemption argument that the defendants made in the district court. They've abandoned that argument in this court. The argument was that the hours of service rules impliedly preempted this California scheme. They haven't pressed that argument here. And so in our view, the hours of service rules are not really squarely before you and preemptive effect of them. But the federal government has pointed out that to the extent that they are relevant, they support our position that there's no F-Quad-A preemption. For one thing, the federal regulations require breaks. And so to the extent that these folks have to take breaks, that's at least in part traceable to federal regulations, at least as much as it is to state law. And the federal purposes and state purposes are congruent. They're both seeking to ---- You're down to two minutes. Sure. I'd like to reserve. Thank you. Okay. We'll hear from the United States. Good morning, Your Honors. May it please the Court, I'm Jeffrey Clare. I'm counsel for the United States as amicus in this matter. Your Honor, I'd like to begin by addressing the subject I perhaps know least about, the effect of the state regulations. That was a good place to start. I thought so. The effect of the state regulations here, we took as our starting point in formulating the position of the United States that the employers, we could not dismiss these kinds of preemption claims simply because the employers might be able to accept the additional premium wage payments or civil penalties under the statute as a cost of doing business and going forward. So we have taken as our premise that the state law does apply here and does have some effect on the carriers. The question for ---- In fact, in your brief, you take the position that the penalties continue even after the premium wage is paid. Your Honor, that is our position. I base that solely on what I take to be the plain language of the IWC order, which in one section says that if a break is not provided, the employer has to pay an extra hours of compensation. It says in another section, Section 20, that an employer who violates this requirement is subject to civil penalties. But why would the answer to that question, whether civil penalties do or do not apply, affect the analysis? I mean, let's say you have a very high minimum wage in a particular state and severe penalties for failing to pay that higher wage, that kind of law would still not be preempted. And so I guess I'm not sure why it matters whether the civil penalty applies on top of the premium wage or it doesn't. I guess to me the question is, regardless of how the State law works, is it sufficiently related to prices, routes or services to be preempted? Because a State can do whatever it wants in this area as long as it isn't related to those things. That is, I think, an accurate characterization of the preemption question presented by the Court. The question is, are the effects that are imposed by application of the State meal and rest break law, are they, do they fall within the ambit of the statute that talks about laws that are related to a price, route or service? As an initial matter, the law does not expressly refer to price, routes or services. It doesn't take as a point of its application or as a factor that bears on its operation some matter concerning rates, routes or services. The only factor that bears on its application is how long it's an employee on duty. And that is a criterion that applies in any industry to which a wage order like this one applies. So there's no express. But there's a specific order applicable to this industry. I'm sorry? There's a specific order applicable to this industry. Yes. There are other orders that apply to other industries. That's correct, Your Honor. They could be the same. They could be different. Even as to the one specific to Order 9 specifically applicable to this industry, it operates solely by reference to the number of hours an employee is on duty. It does not operate by reference. But there's nothing that would prevent the commission from making it six hours for a different industry or seven hours before meal breaks. I believe that's correct. Okay. So is this really a case of a provision of general applicability or are we dealing with an order here because we're dealing with an order applicable to this industry? Is this now a specific order dealing with this industry that is not of general applicability? Well, even with respect to the operation of this particular order, it applies to transportation in general, which would include more than the motor carrier industry. I'm sorry? This applies to transportation in general, not just the motor carrier industry as an initial matter. Secondly, with respect to the meal break, in addition to the provisions of the order, there is a California Labor Code provision that prescribes the appropriate break period for meals. And I believe that that does apply to every industry. And so that would, in particular, be a requirement of more general applicability. So what does transportation include that trucking doesn't? I'm sure lots of stuff, but I'm just wondering what airline pilots? I can't give you an example right now, Your Honor, but my understanding of the law is that it is broader than the motor carrier industry. But not as broad as every labor in the entire State. And if you just look at the order, it's much narrower. With respect to the particular order, yes, it is not to every. So what does that do to your argument that this is a provision of general applicability across the State? I mean, this is an order that applies to this industry only. I'm sorry, Your Honor, there are, I believe, 17 of these orders. They may vary to some extent with respect to the timing or frequency of breaks, but they all take as their operative premise that it is necessary to provide, as a matter of employee welfare protection, some opportunity to take a meal or to take a rest period. So while the particulars may differ or they may not differ, and candidate, Your Honor, I don't know what the requirements are of each of the 17 orders, but the general principle is the same. The State has concluded that as a matter of employee welfare protection, employees should have an opportunity to take a meal off duty. Employees should have a brief opportunity to take a rest period during the course of their duties. If either of these cases were brought by long-haul truckers traveling interstate, would the preemption question be different? The preemption question in terms of the conflict preemption might be different because with respect to conflict preemption, when you're dealing with long-haul truckers moving in interstate commerce, there is a Federal regulatory requirement that imposes break requirements on interstate law. This case does not present those questions because it's our understanding that these are all short-haul drivers. They report to and report back to at the end of the shift the same location. They are involved. The trips themselves occur wholly within the State of California. Federal regulations do not impose a break requirement with respect to short- haul drivers. Now, it had been the Secretary's original intent to impose such a requirement. The requirement was invalidated in D.C. Circuit litigation. In response to that litigation and in conformance with the holding in that case, the Secretary amended the requirements so that the specific break period that is otherwise required for long-haul drivers does not apply to short-haul drivers like those that are issued. And that for us really is as far as we think the Court needs to go in addressing the conflict preemption argument. There simply is no Federal regulatory requirement applicable to these drivers. Back to the statutory question, if I may, Your Honor. Because there is no express provision in the State law that expressly refers to rates, routes, or services, we're in that part of the inquiry here where precedent says you look at the effect of the law. And the standard is it has to have a significant effect, not a remote or tenuous effect on rates, routes, or services. And in answering that question, the Supreme Court precedent most recently in the Dan City case makes clear that you have to consider the regulatory, the overall background regulatory objectives of the Federal statutory scheme. Those objectives were really to take the States out of the business of doing things like imposing entry controls, tariffs, rate restrictions, and so forth. So when you have a law that is of general applicability, whose effects are entirely indirect, whose essential effect is basically to increase the kind of cost, impose a kind of cost of doing business that is imposed generally on all employers. You would agree that the Roe case, however, tells us to read broadly the phrase routes, services, and prices. Absolutely, Your Honor. It's a term of very – the Supreme Court has noted on several occasions, not just in Roe but in Morales and in Rollins as well, construing the related airline deregulation cases. But this is – these are terms of great breadth. And with respect to – and I'm sorry to interrupt you. Sure. I'll try and get my question in before your time is up. Convince me that defendants are wrong when they argue that the primary purpose – you've talked about the primary purpose of the F-Quad A – was to ensure as much as possible that routes, services, and prices are determined by market forces. Is that the primary purpose? That is – yes, that's an accurate statement of the Supreme Court, Your Honor. But when you have a case like this one, where the laws really operate at a sort of anterior to the basic formation of a transportation transaction, they dictate the sort of terms and the employee working conditions for all employers. We think the Seventh Circuit's case, the S.C. Johnson case that we've cited in our brief, really has the correct approach there. It distinguishes between things like general workers' compensation laws, the tax structure, other things that are simply the sort of background areas of regulation. As matters that Congress was really not concerned with here. And that weighs heavily against preemption. That, and in conjunction with the traditional presumption against construing a statute to displace a State's traditional exercise of police power. Certainly, employee welfare protections like these are a longstanding exercise of that power. And for that reason as well, there is a – I think a kind of thumb on the scales against preemption for that reason. Okay. Thank you. Thank you. We'll hear from the police. Your Honor, I'm James Hansen and I represent Penske Logistics and Penske Truck Leasing. I started to jump up before a little anxious after Mr. Gupta's argument. I want to start out with, obviously we believe it's preempted. And I want to start out with the analysis that when you get into laws of general applicability as to how those should be applied, we know that if it is a law that is directly related to a motor carrier's prices, routes, and services, that's the traditional regulation of motor carriers that has existed since 1935 when the Motor Carrier Act was passed. I came into the industry in 1981 at the beginning of deregulation and have seen it in this whole 30 plus years of practicing law, have seen how deregulation, what it has meant to the industry in terms of improving competition, lowering costs, those types of things, which when Congress deregulated the motor carrier industry in 1994, it created a whole new ball game for transportation to improve competition as Congress said. So what you have is, we know that if it's direct, and that's what Justice Scalia, it's interesting that when Dan Citty quoted Justice Scalia, it left off the last portion of what he said in our garage. They quit with transportation to property. That's not an issue. As you noted, Your Honor, this is... It seems to me that, and I'm just speaking for myself, telling you what my thoughts are in this case, the only even plausible part of that that would be brought into the equation is price, but it seems to me that it's indirect, that it's a cost of doing business. And let me give you an example and tell me whether you think this would be or would not be preempted. Let's suppose the State of California says, you know, we think employees are all working too hard, and so we're going to have a new minimum wage, and after five hours a day, the employer has to pay double time, and after seven hours a day, they have to pay triple time to everyone who works within the State of California or to 12 industries or something like that. That would obviously drastically increase your costs of doing business and your prices, but would that be preempted or not preempted? The way the case law has come out, we started with MnDONCA that said... Now, tell me the answer. Would that be preempted or not? Yes, it could be. At some point in time... Based on what Supreme Court precedent or precedent from this Court? I'm looking for the case site. There are cases that have said, including the U.S. Supreme Court case that uses an ERISA, but it's been cited in the motor carrier cases, and I believe it was the Air Transportation Association case from the Ninth Circuit, that said at some point in time, the increase in costs could result in increase in prices and therefore become preempted. That was an Air Transportation Association case, a Ninth Circuit decision. What I was talking about as I was beginning is when you take a law of general applicability and you apply it to a motor carrier, you then have to look, when you apply it to the motor carrier, does it have a direct effect on prices, routes, or services? Well, I could see that it might if you had a law that said, for example, no employee may be required to go more than two miles from their main base of operations of their employer. Well, that would obviously affect everything. But I have a difficult time seeing how a modest economic law like this is preempted. This case was not decided on economics. This case was decided on routes and services. I know that. That's not plausible to me, though. I'm just speaking for myself. At some point in time, though, you can't affect prices, for the most part, without affecting routes and services. That's what the plaintiffs and the U.S. That sweeps way too far, doesn't it? I mean, I can just sort of count the number of regulations. California has weird, onerous air quality standards, right? Apply to trucks. Correct. Must make it weird being unusual. I don't mean to be pejorative by it. But they are unusual for the rest of the country. That must make trucking significantly more difficult or expensive in California than in other places. There may be motor safety standards that some states have that others don't. There's lots of stuff that increases the cost of doing business in a state. It's just California is an expensive state to do business in. It's just one of those realities. Yes. But the fact of what... You're not fighting that one! I'm not going to disagree with you. I hear lawyers are expensive here, too. But what the law does is it says to a motor carrier what Air Transportation Association says you cannot do. You cannot tell a carrier when it can and cannot provide services. And that's what this rule does. It says to a carrier, you must stop providing services during the course of your day. We've talked about the hours of service. There are short-haul exemptions, which the Secretary of Transportation didn't agree with but had to abandon because they weren't properly in there. They don't have to. They don't have to do anything of the sort. They can put a second driver in the cab and the second driver can take over and they just have to stop long enough to switch seats. I don't believe that is correct, Your Honor. Why not? How is that a violation of the statute? Because in the meal break rule under California law, the driver, the one taking the break, has to be able to leave his work and do whatever he wants. He can leave his place of employment and go someplace else. So you can't just simply switch seats and meet the requirements of the law. That's not going to be considered a meal break compliant with California law. That would not be possible. And what the plaintiff talked about is, okay, we've got an installer, so one watches the truck while the other one takes a break and then vice versa and all of a sudden we've taken an hour and a half of breaks during a general 12- or 14-hour day that a carrier's drivers can operate and we've turned it into three hours of breaks during the course of the day. So you think that, well, never mind. I'm not going to pursue that. How is that different from just making it more expensive? You know, to accept the argument that it is simply a cost. So tell me how this has to interfere with service. It interferes with service because it says to the driver, you may not provide services. It says to the driver, but it doesn't say that to the employer. What if you had each driver works only five hours a day and then you don't have all these meal break problems and they come back and the next driver takes over for five hours and the next driver takes over for five hours and you can have a 15-hour day? It isn't what it says to the driver. The question is what it says to the company. We should leave to the carriers to decide with the competitive marketplace how it provides its services. What the court talks about is efficiency, innovation, low prices, as well as variety and quality of transportation services. But if all carriers in the state of California are subject to these same rules, you're on the same competitive footing and you can be as creative in getting around these rules as you want to be. You're not on the same footing because you're not operating necessarily in the same areas at the same time. So you can't have a law that you have to work around. You have to let a carrier work out with its drivers. As a driver, these are interstate drivers, contrary to what the DOT or the government said. These are interstate drivers subject to the hours of service regulations. And we can't have a workaround with that. They have to be able to work out with the flexibility given by the hours of service as to how to meet the demands of the customer in innovative, using technology, creating a variety of types of services. How do you deal with Judge Graber's earlier question about the three-level minimum wage? At some point in time, as the Air Transportation Association says— No, no, you remember what the question was. Let's say after five hours— It just gets hugely expensive. I thought you were talking about the one-two, you know, the double-time and triple-time. Yeah, I realize, but you've given a lot of— I mean, I was sort of the one where it gets five hours, you get regular, and then after five hours, you get double pay, and if you're eight hours, you get triple pay. Because they worry so much that workers are working too hard. We haven't done the analysis of that in our case as to what effect would that have on prices. Okay, do it now. I was going to say but, but I think at some point in time, it would get to the point where it would result for customers in increased prices because in order to bear those costs— But if all of the truckers face the same cost structure, there's no exceptions. If everybody doing trucking in the state faces the same law, and in fact, I assume from the question that this applies to all workers in the state, how would they be at the competitor's advantage? The fact that you can comply with the law or that it's a law of general applicability subject to everybody, I think Rhode—well, Morales originally says that would drive a wide swath through the preemption analysis. This was Justice Scalia's— But you do— You can't say that about a law of general applicability. You do agree that it removes the competitiveness argument. You may have other arguments, but the argument that this is sort of making them incompetitive, and you know, if everybody faces the same cost structure, I don't see how you can argue it. You know, it's not like they can go down the street to a different trucking company and get a cheaper driver or a cheaper haul because they have cheaper drivers, right? Right. But if we leave it to the marketplace, then it's the carriers who work those things out with their customers and their drivers. It's a matter of recruiting drivers as to who has the best policies. It takes away that competition. It takes away the competition with customers regarding using technology innovation, deciding the variety and how you provide the transportation services. That is done in the marketplace. That's where it's supposed to be done. What effect does this law have on the use of technology? You've said that several times, but I don't understand what effect this has on technology. It all depends on how a carrier wants to set up its operations using its routing and scheduling. It has programs that it uses as to how to route the drivers in the most efficient way, mileage-wise, timing-wise. And that's how technology is used. And what we've done is we've said... But all you'd have to do with this statute, every trucking company in California would have to program into its software that there has to be somewhere along the way a break so that a person can eat or, you know, rest their eyes from the road or whatever. I don't understand how the law has an adverse effect on technology. It's the use of technology to create variety in the manner in which you provide your transportation services, which affects the competitiveness from one carrier to another. Can I do it in a way that I can do it cheaper for my customer than another carrier? And carriers use technology to do that. If you plug in a route and it says you should take this route because it's the most efficient and cost-effective manner of making that delivery, but there's not a place for a truck to legally park because they can't just pull off the side of the highway. That's illegal. There are rules that say you can't do that. So you've got to plan it on a route where they can be able to get their truck off the road. And that whole process increases the effect on... What location in California is there that there isn't an exit on the freeway every three or four miles? I mean, are there sort of long distances I don't know about where you can go for 25 miles and not get an exit? Yes, and there's problems even in delivering in downtown Los Angeles where you can't take a truck. Or the parking problem. Exactly, with a truck. That's exactly right, yes. And to say nothing about the difficulty of getting a good meal downtown. That's the second problem. That's a different kind of meal break. Some of this discussion today has highlighted what is a problem for me, I will confess, and I'd like you to comment on this and other counsel may as well. We have a very thin record on appeal in this case. I have more information about facts in the green briefs from both sides than I do in the briefs with the direct parties. Can we decide this preemption question is a purely legal matter on this record? You can. The issue is a legal one. It is not a factual one. We presented evidence at the lower court on the effect it had on the prices and the routes. But the district court decided it strictly is a matter of law without regard to facts because of either the actual or likely effect. Can you use facts? Yes. Do you have to use facts? No. I have to use facts because of the likely effect that it will have on prices, routes, or services. And that is consistent with the Ninth Circuit law. That idea of actual or likely is from Ninth Circuit cases. Thank you. All right. Thank you, Your Honor. We'll hear from the full counsel. It's Mr. Jones. Mr. Jones. Good morning, Your Honors. May it please the Court. I'm Robert Jones representing the Pele-Vitrin Express, Inc. I wanted to make just a couple of really quick points. And I'd like to go to address some of the specific questions that have been asked by the Court. Initially, I wanted to point out that there's only two basic differences between our case and the Delft's case that you've been discussing so far. And that is that our case was decided directly on a 12C motion to designate on the pleadings as opposed to the MSJ Rule 56 in Delft. However, in our case, we also argued this in an alternative manner. And the Court found and produced all the facts that supported our position that this is, in fact, should be decided as a matter of law. And that part of the case became moot and was not ruled upon by the Court. But the cases since then, all the district courts have generally applied this as a matter of law and done these motions for judgment on the pleadings. The second thing that is different, is somewhat different, but hasn't really been discussed too much except a little bit by the government, is that in our case, this is a classic interstate carrier operation where the company operates nationally. Goods are shipped from other terminals throughout the country. They're brought in by geographic location. And we're talking about 70-foot truck and trailer rigs. They're brought in to the terminals within the state. There were four terminals that Vitronad brought in. The goods are unloaded off the back of the truck, moved across the dock, and loaded into similar-sized trucks for distribution to the end users that were designated at the beginning of the transportation. And specifically, it happens exactly in the opposite direction in the same way, is that the drivers who make those deliveries also pick up goods from the shippers, bring them, cross-dock them immediately into trucks that take them to places throughout the United States. So this is a standard operation in interstate commerce, and that the drivers are all equally qualified to drive in and out of the state, drive within the state, and they are subject to the hours of service regulations of the federal government. The local trucks are sometimes smaller, right? Sometimes there are some smaller trucks, and we have a factual record. Depending on the loading facilities of the passenger, right? Yes, Your Honor. But in most cases, in the vast majority of the cases... But they have to qualify to drive... The larger trucks. The larger. So how does that help me? The reason that helps me is that it takes us to that next issue. The issue that has been discussed here is what's the precise requirements that are under consideration here with respect to California meal and rest periods? And I think there's some significant confusion as to how those laws apply in California. Starting with the meal period laws. The meal period laws are very specific in the number of meal periods that must be provided to drivers each day. They're very specific with respect to when, during which periods of time, those meal periods must be provided to the drivers. They're also, and most importantly, very specific in saying that, in holding that the drivers cannot be required to perform any duties during those meal periods. And there's a myriad of class action case laws going around in California right now based upon those specific, very detailed requirements. It isn't a case where the state requires that you have to provide a meal period to a driver during a day and that you have to provide rest breaks that are reasonable for drivers during the day. These are very, very specific requirements. And in order to comply with these requirements, if you have a 70-foot rig, here's what has to happen. Let's say it's a meal period or a rest period. The driver must find first a safe and legal place to pull that rig off and lock it up and secure it. It has to be safely shut down, and then after the meal period, and then the driver has to be able to completely leave that rig unattended. There's no exception in the law that says the driver can be required to keep his eye on the truck. In fact, that's the specific most onerous requirement of this law. You say that, but what about that second guy in the truck? Can't he just leave him in the truck? Well, if you had two drivers in a truck, and of course... But you said has to. Has to means there's no choice. So just tell me, what do you do with a second guy in a truck? You lock him in the truck? No, there are no second guys in our operation. You could put a second guy in. But we certainly could. You could put a third guy in. Okay, so when you say has to, you don't mean has to. No. You mean wants to, prefers to, right? No, if there's... If there's a second guy there, you don't have to lock it. Okay. You don't even have to stop it for very long. He could just keep driving and come back around the block, right? You'd have to. Well, no, you can't do that under the regulations, but... I'm sorry? You couldn't do that under the California laws. I mean, you can't idle trucks. But what you're proposing is that you would have now, instead of having one meal period, now you'd have to have two meal periods. You know, you'd have where these... But there's nothing in the regulation that requires that that be stationary. One person can eat lunch, take a nap, snore, pay no attention to anything for 30 minutes, and then the other person can do the same. There's nothing that I see in the regulation that would prevent that, nor is there anything, because the way the regulation is set up, if each individual, to go back to my other example, if each individual works six hours or less, the employer does not have to provide a meal period. So you could simply have a six-hour workday or a five-hour workday, and it would be more expensive because you'd have to have more drivers and so forth and so on. But it's not impossible. It's not impossible. And I think that we've hedged around... It would be a have-to situation. So when you say have to... Okay. ...you were overstating. No. You sort of kind of clarified things, but actually making them more... All right. Your Honor, if you have one driver, this is what applies. So why don't you tell us what actually this means in practical terms. What this means, and I guess I could go right to the question that's been asked and hasn't been really addressed. You're now seven or eight minutes into your argument, and you haven't sort of advanced any. Why don't you just go to the meat of the argument? The meat of the argument is that at some point if you increase the costs to the point of having to have twice as many drivers, which is what could be required, in order to provide the same services, you are certainly interfering with the You have a direct relationship on also the rates, but also on the services, and also on the routing. All of these requirements that California have that require that the duty-free meal periods will significantly increase the cost. And there's no question that if you increase the cost, that's going to increase the prices. Yes. Isn't there a second person in the truck that's our driver? No. That's only in the DILT's case. In our case, these are drivers. These are like interstate drivers where you have one driver. These are delivery drivers, local delivery drivers. There's only one driver here. And that driver has a route. And what the case is, is during that route, that driver has to stop. And that driver has to stop a certain number of times for a certain length of times, and it takes a lot of time for those stops to take place. Well, they have to make stops to make deliveries. But they can't park these rigs where they make the stops. That's something else that was raised in one of the briefs. You can't just take a rig, back it up into a loading dock, lock it up, and leave and take 30 minutes. You can't. You have to take those trucks, and you have to place them somewhere. Well, that may be true for a meal break, but it may not be true for a rest break. Well, for a rest break, you can't. If the driver has to attend the truck at the time that they're at the loading  You are responsible for that truck. The driver can't take a 10-minute rest break where they can be completely relieved of duty while they're at the locations where they're making these deliveries. Because the customers won't allow that. So if a driver said, I need to use the restroom, can I go in and, you know, take five minutes in the bathroom and grab a cup of coffee, they're all going to say no? No. How unrealistic. You're setting it up in a very unrealistic way. But that's not a five-minute, that is not, that's a five-minute or a quick break that would not comply with the rest break requirements of California law, which are very specific. Ten-minute rest break, uninterrupted, net. Must be completely off duty. So that's the issue that we have here. There's one other thing, since you mentioned that my time is short, that hasn't been raised before, and I think that really needs to be raised at this point. These are in no way generally applicable laws. As was pointed out, this is Wage Order 9. But there's a long history. But there are a lot of other wage orders, too. Right. And there are large, it may not be every industry, but there are at least a very, very, very large number of industries as to which the employees must get a meal break and rest breaks. Yes. But all, there's a long history of all of those wage orders, or a good number of those wage orders, and Section 512 not being equally applicable. They are not general laws. They actually have carve-outs. And we mentioned this briefly. But, for example, Section 512 has the specific requirements, the number of breaks, the periods of time, and to be duty-free. None of those requirements under 512 any longer apply to motor carrier, apply to commercial drivers. They are carved out. There are a lot of carve-outs within the wage orders. But the way those carve-outs apply is they only apply to employers and employees who have chosen to be represented by a union and have a collective bargaining agreement that makes some mention about a meal break. So if you have, and this is specific in the law. This is not a non-competitive law. This is a law, these laws favor union organized employers over unorganized employers. Well, what if we agreed with you on that? I'm not saying that that's true. But what does that have to do with this particular statutory exemption? It isn't about that topic. It's about whether the state regulation has to do with the root price or service. Right. Not whether it favors or disfavors union organizing. Well, how it would apply, Your Honors, goes right back to the question that you presented. If I am a union, if I, as the Chiefs are saying in the brief, we have 50,000 drivers, they're subject to collective bargaining agreements. None of those agreements require that there be a specific number of meal periods, that those meal periods be off-duty, or that those meal periods be taken at any time. But the wage order allows individual agreements with drivers, too. That's not, that's the other thing I wanted to clear up here, Your Honor. There is, there are two separate provisions that have been discussed here and have been confused, I believe. The first is that you have to provide an employee, let's take the meal period, in both the wage order and in the code. You have to provide that first meal period before the end of the first hour. The employee cannot, you know, cannot waive that first meal period unless their entire day ends at six hours. So there's no way an employee can waive the meal period. But if they waived it, it would be entirely up to them in agreement with the company anyway. The second meal period could be waived at ten hours if there was agreement. But there's no way the employer can enforce the employees to not insist that they take, get both those meal periods in accordance with the law. There's a separate provision for on-duty meal periods. That on-duty meal period allows for, where the nature of the work prevents the employee from taking a meal period, allows the employer and the employee to not take that meal period and to be paid for it. That's a completely separate requirement. And as Your Honor pointed out, it's something that the employees can simply say, I don't want to be bound by anymore. So it isn't that employees have the right to take, that employers have any right at all to require employees to waive any meal periods. These are strict requirements on the employers. And if you had an employer who could waive those meal periods through a collective bargaining agreement, then we go back to your, you know, they say that you don't have to have those meal periods at the specific times. And then you go back to your question, okay, so the non-unionized employers have to hire twice as many drivers. They have to have two drivers in the truck. That they have to put. They don't have to. They can choose to do that. They can choose to. As a way of not getting, not having to provide a meal period. Or they can provide a meal period. Or they can pull off at a truck stop and have lunch. And then continue on with their deliveries. It's not a have to. It was simply an alternative that maybe costs more. Right. What it's going to do is it is absolutely going to make that employer unable to compete in the marketplace. It's not going to further purpose. But all the trucking companies are subject. What you're saying is because it makes it hard for union and non-union companies to compete with each other. But that's really not the concern of this statute. This statute has to do with otherwise equally situated people. So if all the non-union trucking companies are in the same boat, and all the union trucking companies are in the same boat, why does this federal statute have anything to say? Because that's precisely what this statute is designed to prevent. It's there to foster entry into the system and allow that the free market competitive market forces take place. And when the state says that you can be subject to, you aren't going to be subject to these requirements if you choose to, your employees choose to be represented by a union, you're not going to be subject to them. But if your employees don't choose to be represented by a union, you will be subject to them. That is not the free competitive market forces in action. That is the state making it impossible for non-union employers to compete. Thank you. Thank you, Your Honor. Mr. Gupta, I think you have a couple of quick points in rebuttal. First, picking up on a question that Judge Zuhari asked, there isn't a record here, and I think it's important to reiterate that the Supreme Court has said that preemption is a demanding affirmative defense, and the burden is on the proponents of preemption, not just to overcome the presumption against preemption, but to show that the effects that they claim are actually taking place. There's no evidence of that here, and they haven't attempted to ground their position in the evidence. And in fact, even if they had proven everything that they claim about the operation of this statute, I think as became clear in the colloquy with my friend Mr. Jones, this is really just an increased costs argument. At the end of the day, what the defendants are claiming is that the inputs into the system, the labor inputs, may have to be increased to comply with background California labor law, and that that may affect their operations. But that's precisely the way in which operations were allegedly affected in the Mendonca case, where this Court rejected an increased costs argument. What is there to this argument, Mr. Jones' argument about not being able to take meal breaks or rest breaks at customers' docks? At customers' what? Place of business. When they make deliveries. Yeah, I don't see any reason why they wouldn't be able to do that. When they stop the truck, they'd be able to take their break then. Well, they can't very well leave the truck at the loading dock because there are presumably other deliveries that need to be made. They have to go park them somewhere on the property. I mean, let's say we have a loading dock here, and you couldn't get two trucks in here. It's just a small area. Sure. So if somebody wanted to say, well, I just made a delivery, and I'd like to take a break here. If we had another delivery coming, I don't run these things here. We thought you ran everything. No, no. Very liberal. But I assume this kind of demand, you know, we couldn't always accommodate it, I'm sure. Just from looking at the small area we have, we have just barely enough area for a truck to turn around. Sure. And I assume there are other places like that where, you know, you couldn't count on saying, oh, I'll just leave the truck there and leave. Maybe for a rest break, but certainly not for a meal break. Well, but it's hard for me to imagine that there's nowhere, that these are city drivers, that they can't find a place where they'll be able to park the truck. Illegal parking statutes aren't preempted. Well, it's not that they can't find, but they are more limited. There are load limits for trucks on certain roads, and you can't take a semi down a neighborhood street, for example. So it's not a free-for-all, correct? That's right. And in fact, some of the, if I can, some of the comments you've made about affecting price, we've heard several scenarios today that are more than affecting price. They affect service, and they affect route. True? That's correct. I also want to get from you before I get cut off, one final thing. You talk about this presumption against preemption, and I've read about it, and I've heard about it. I've looked at Roe. Roe does not articulate a presumption against preemption. True? That's true. Roe doesn't mention the presumption. It was an easy case. Ours garage is an F quad A case that does invoke the presumption against preemption, and this court has repeatedly invoked the presumption against preemption. So does presumption only apply in an easy case or an uneasy case? Well, I think, you know, presumption is a tool that you may not need where the preemption is so obvious or the lack of preemption is so obvious. Or where the record is more fully developed. Right, right. But I think, you know, the presumption does do some work, and the Supreme Court has made clear that it applies in both expressed preemption cases and implied preemption cases. And I think this is a classic case for the presumption because you've got these books. These laws have been on the books for 100 years, and they operate in the core area of worker health and safety that's always been regulated by the states. You would think that if Congress had intended to preempt those generally applicable laws, that somebody would have said so. This would have been a big deal, and it would have appeared. You're talking about Congress here. Yes. And, you know, there's no indication whatsoever in the legislative history that anyone had that in mind. This is a big issue, not a small issue at the periphery. So I think the presumption does some work here. And, you know, at the end of the day, you've got a state law that's indifferent as to prices, routes, or services. Thank you. The case is argued and submitted.
judges: Zouhary, Kozinski, Graber